UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD, CO., et al., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-02-0438 |
| HEARTLAND BARGE MANAGEMENT, L.L.C., et al., | § § § | LEAD |
| Defendants. | § § | |
| UNITED STATES OF AMERICA, | § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-02-2314 |
| HEARTLAND BARGE MANAGEMENT, L.L.C., ORGULF TRANSPORT CO., AMERICAN COMMERCIAL LINES, L.L.C., PROLER SOUTHWEST, INC., GENERAL STEVEDORES, INC., *in personam*; and Barges RBL702B, OR6275, and ACL9745B, their tackle, apparel, etc., *in rem*. | § § § § § § § § § | MEMBER |
| Defendants. | § | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The action came for trial on the merits before the Court, sitting in admiralty without a jury, on December 15, 2004. On December 17, 2004, the evidence concluded, the parties rested, and the Court heard the arguments of counsel. After considering the pleadings, the evidence, the arguments at trial and post-trial briefs of counsel, the Court makes the following findings of fact and conclusions of law. To the extent that any conclusion of law is more properly characterized as a finding of fact, and vice versa, the Court adopts it as such.

**Introduction**

This consolidated admiralty action arises out of a series of events occurring on June 8-9, 2001 in the Houston Ship Channel when the remnants of what was once Tropical Storm Allison ("Allison") revisited the Houston, Texas area.  On those dates unprecedented, record rainfall in terms of duration, intensity, and amount caused extreme flooding in the Houston area.  Record flooding on Buffalo Bayou caused the parking garages and other areas in downtown Houston to flood.  It was the most severe flooding in downtown Houston since the Addicks and Barker reservoirs were constructed in the 1940's.

**Findings of Fact**[1]

1.   Union Pacific Railroad Company ("Union Pacific") is a business organization and at all times material hereto was the owner of bridge 5A and its fender system located at railroad mile post 3.55 on the Strang Subdivision located at the west end of the Port of Houston Turning Basin.[2]

2.   The United States of America ("United States") was at all times material hereto the owner of the vessels the SS MOUNT WASHINGTON ("MOUNT WASHINGTON"), SS EQUALITY STATE ("EQUALITY STATE"), and SS DIAMOND STATE ("DIAMOND STATE").

3.   The Port of Houston Authority ("Port Authority") is a quasi-governmental agency, which

---

[1] During the course of the trial, Proler made a number of objections to the Plaintiffs' exhibits. To the extent such objections were not ruled upon at the trial, because this case was presented as a bench trial, the Court's findings of fact reflect rulings on admissibility and the appropriate amount of weight, if any, the Court determined should be afforded to those exhibits.

[2] *See* Joint Pretrial Order (Dkt. #148), Section 8, Agreed or Stipulated Issues of Fact No. 1, pg. 24, pg. 26.

manages certain facilities at the  Port of Houston  including City Docks, 4, 5, 12/13, and 14/15.

4.      Proler Southwest, Inc. ("Proler") is a business entity engaged in the metal recycling/scrap metal business at its facility in Houston.  Proler's facility is adjacent to Buffalo Bayou. Proler operated a barge dock on the north side of the bayou, east of the Waco Street Bridge and approximately 3 miles east of the Port of Houston Turning Basin.

5.      Heartland Barge Management, L.L.C. ("Heartland Barge") is a business entity and at all times material hereto was the owner of Barge RBL702B.

6.      Orgulf Transport Co. ("Orgulf") is a business entity and at all times material hereto was the owner of Barge OR6275.

7.      At the time of the incident in question, the MOUNT WASHINGTON, EQUALITY STATE, and DIAMOND STATE were moored in the Houston Ship Channel at the Port Authority's City Docks 4, 12/13, and 14/15, respectively.  All were in Reserve Operating Status with skeletal crews maintaining their readiness for activation within five days if required for military use.[3]

8.      In the early morning hours of June 9, three barges broke from their moorings. RBL702B, owned by Heartland Barge and OR6275, an unmanned cargo barge owned by Orgulf broke away from Defendant Proler's Buffalo Bayou facility, and ACL9745B, owned by American Commercial Lines, L.L.C. ("ACL") broke away from General Stevedores, Inc.'s ("General Stevedores") facility, also on Buffalo Bayou.

---

[3] *See* Joint Pretrial Order (Dkt. #148), Section 8, Agreed or Stipulated Issues of Fact No. 1, at 23.

9.     The drifting barges traveled down the Houston Ship Channel and allided with the fender system that protects Union Pacific's railroad bridge, then struck the moored MOUNT WASHINGTON owned by the United States.

10.    The barges' allision with the MOUNT WASHINGTON damaged that vessel and its moor so severely that the ship broke away from and damaged City Dock 4 and allided with two other moored ships, the EQUALITY STATE and the DIAMOND STATE, before finally alliding into the Port Authority's City Dock 15.

11.    In 1998 the fully loaded Barge LILA I broke away from Proler's facility during Tropical Storm Francis ("Francis").  It was standard practice for barges to be secured at the Proler dock by tug personnel using mooring lines supplied by the towing company.  At the time of the breakaway, the water level in Buffalo Bayou was approximately 4 feet above the level of the Proler working dock which was 8-9 feet above the normal water level in Buffalo Bayou.[4]  The Buffalo Bayou flood waters during Francis in 1998 ultimately crested 7-8 feet above the surface of the Proler working dock, or 11-12 feet above the normal water level in Buffalo Bayou.[5]  Francis produced record flood water levels in Buffalo Bayou at the Proler facility.

12.    After the breakaway of the Barge LILA I, Proler sought recommendations from marine consultant, Earl Hatfield ("Hatfield"), to improve the mooring system at the Proler dock towards preventing future barge breakaways.  Hatfield recommended that Proler raise the surface of its dock; change its mooring bollards by placing a bar across the bollard

---

[4]  *See* Dkt. #185, Direct Examination of Walter Keith, pg. 20, 26.

[5]  *See id.* at 37.

to keep mooring lines from slipping off; change its mooring practices by increasing the slack in mooring lines 10-12 feet to allow for fluctuations in the Buffalo Bayou water level.  Hatfield also recommended that Proler add additional lines or use its own lines to moor the barges, instead of depending upon the towing companies; add one or more additional mooring lines to barges if significant rainfall was forecasted; and develop a hurricane preparedness plan for extreme weather circumstances.

13.     Proler complied with all of Hatfield's recommendations.

14.     Proler also took additional steps beyond Hatfield's recommendations to improve barge mooring practices by using 2 inch nylon mooring lines rather than 2 inch polypropylene lines, which are the standard mooring lines used for mooring barges.  Nylon mooring lines are 33.33%-50% stronger than polypropylene lines.  Proler also had a National Oceanic & Atmospheric Administration ("NOAA") weather radio with an alarm installed in the office of its Plant Superintendent, Walter Keith ("Keith"), to better monitor weather conditions.

15.     Tropical Storm Allison formed in the Gulf of Mexico on Tuesday, June 5, 2001, and moved across the Texas coast and drifted north to Lufkin, Texas, about 120 miles north of Houston.

16.     Flash flood watches and warnings were maintained for Harris County for June 5th, 6th, and 7th, 2001.  Over the course of those dates, various bulletins contained predictions for rainfall accumulations of 2-3 inches, up to 7-14 inches.  Warnings included notices of dangerous and potentially life threatening flooding.  Allison was noted to have dropped 8-10 inches of rain in numerous locales causing serious flooding of roadways

and subdivisions.

17.    At 10:30 a.m. on June 5, 2001, the National Weather Service issued a Flash Flood Watch for fifteen counties including Harris County (the "June 5 watch").  The June 5 watch stated that it was in effect through Wednesday, June 6, 2001.  It reported that rainfall totals through the morning of June 6 would likely exceed 5 inches along and east of Highway 59 with possible isolated accumulations of 8 inches.  The June 5 watch also warned that "bayous may overflow their banks" because of the heavy rain.

18.    Based on the June 5 weather forecast, Proler added one or two mooring lines to the barges at its facility and had no problem with the increased water level in Buffalo Bayou during Allison's passage through Houston.

19.    Keith remained on site that day to monitor a barge and the Buffalo Bayou water level. Keith left Proler at 8:00 p.m. after a boat picked up a barge that was on site.  Although the water level in Buffalo Bayou rose significantly, the water level did not exceed the level of Proler's dock on that evening.

20.    On June 6, 2001, Houston experienced some flooding as a result of heavy rainfall.  As Allison moved inland, she lost strength and was downgraded from a tropical storm, but the low pressure system continued to create bands of rainfall.

21.    The Barge OR6275 was towed to Proler's facility, approximately one-and-a-half miles upstream of the United States' ships, on the night of June 6-7, 2001, and was logged as moored there at 7:00 a.m on Thursday, June 7, 2001.[6]  The tug crew that delivered the Barge OR6275 to Proler moored the barge using four nylon lines of 2 inch diameter.

---

[6] *See id.,* No. 4 at 24.

22.   The Barge OR6275 was loaded with scrap metal at Proler Southwest's facility on June 7 and 8, 2001, and was recorded as displacing 1,448.2046 gross tons at 11:00 a.m. on June 8, 2001.  The fleet was then called to pick up the loaded barge.

23.   There is no record of the age or condition of the lines used to moor the Barge OR6275, and the lines were not preserved after the breakaway.

24.   On June 6 or 7, 2001, the Barge ACL9745B, owned and operated by ACL, was delivered to General Stevedores facility on Buffalo Bayou approximately one mile upstream of the MOUNT WASHINGTON.[7]

25.   At approximately 12:00 p.m. on Friday, June 8, 2001, the Tug RUBY GONSOULIN pushed two barges up to the Valero Asphalt Dock, or City Dock 5, and began to offload the product in the barges.

26.   City Dock 5 is located immediately west of City Dock 4 where the MOUNT WASHINGTON was moored.

27.   At approximately 2:00 p.m. on June 8, 2001, the Barge RBL702B, owned and operated by Heartland Barge was delivered to Proler's facility by the Tug MR. VANCE.

28.   There is no record of the age or condition of the lines used to moor the Barge RBL702B, and the lines were not preserved after the breakaway.  Though the barge was half loaded, there is no exact record of how much cargo was placed in the RBL702B.

29.   Keith monitored the weather on June 8, 2001 and was generally aware of weather forecasts advising of possible heavy rainfall.  On the morning of June 8, 2001, the remnants of Tropical Storm Allison had a center of circulation in East Texas, which began moving

---

[7]  *See id.,* No. 3 at 24.

southwest.  The National Weather Service issued a Flash Flood Watch advisory at 11:00 a.m., alerting the public to the prospect of further flooding with a broadcast over the NOAA radio.  This Flash Flood Watch warned the public of possible heavy rainfall with possible accumulations in excess of 10 inches as a result of rain falling at a rate of 1-1.5 inches per hour through the evening and overnight.  The Flash Flood Watch was for a twenty-two county area in Southeast Texas, including Harris County.   It contained the following language:

THE THREAT OF VERY HEAVY RAINS WILL CONTINUE ON SATURDAY AS MORE OF THE REGION WILL BE TO THE EAST AND NORTHEAST OF THE CIRCULATION CENTER.  A LARGE SWATH OF HEAVY RAINS FROM NORTH TO SOUTH ACROSS THE AREA IS VERY LIKELY! THIS MAY LEAD TO VERY DANGEROUS FLOODING!

SINCE LARGE PORTIONS OF SOUTHEAST TEXAS HAVE GROUNDS THAT ARE ALREADY SATURATED FROM ALLISON ASSOCIATED RAINFALL OVER THE PAST THREE DAYS . . . THIS ADDITIONAL RAINFALL WILL LEAD TO MORE DEEP STANDING WATER AND OVERFLOWS OF SMALL STREAMS. . . CREEKS . . . AND BAYOUS ACROSS SOUTHEAST TEXAS.

THIS CONTINUES TO BE A POTENTIALLY DANGEROUS SITUATION! REMEMBER . . . DO NOT DRIVE INTO FLOODED AREAS. NUMEROUS CARS HAVE BEEN FLOODED OUT DURING THE LAST FEW DAYS AND RISKING A DRIVE INTO DEEP WATER COULD RISK NOT ONLY YOUR VEHICLE BUT ALSO YOUR LIFE! . . .

30.     The Flash Flood Watch was read every 10-15 minutes over the NOAA weather radio after 11:00 a.m. on Friday, June 8, 2001.

31.     At 3:40 p.m., the Flash Flood Watch was updated with more current information and the updated version was published repeatedly in a continuous broadcast loop over the NOAA weather radio thereafter.

32.     Before leaving work, Keith walked the dock and was aware that two barges were moored

at the Proler facility.[8]  It had not rained at Proler that day and the Buffalo Bayou water level was at or slightly above normal.  The water level was about 6-7 feet below the level of the Proler working dock, and 4-5 feet below the surface of the lower dock.

33.     Keith left the Proler facility some time between 3:30 and 4:00 p.m. on June 8, 2001.  At the time he left, it was not raining, no flash flood warning had been issued for Harris County, and the alarm on the NOAA radio had not sounded indicating that there was severe weather. However, Keith paid inadequate attention to the National Weather Service's Flash Flood Watch, so nothing was done to prepare the facility or the two moored barges for the potential flooding.

34.     At 4:25 p.m. on June 8, 2001, NOAA issued an Urban and Small Stream Flood Advisory to notify the public that heavy thunderstorms on the east side of Houston to near Hobby Airport were predicted to cause street flooding.

35.     The Proler plant closed at 4:30 p.m. for hourly personnel.  Proler's General Foreman and Yard Superintendent, Leslie Smith ("Smith"), and Hector Sanchez ("Sanchez"), a truck driver for Proler, were among the last of the company's personnel to leave the plant at 5:30 p.m. on June 8, 2001.

36.     Keith lives in Dayton, Texas, which is approximately 35 miles northeast of Houston.  While he was driving home, the radio indicated increasing possibilities for heavy rainfall.  In light of this broadcast, Keith called Sanchez at 5:40 p.m.  Sanchez lived near the Proler facility, so he was asked to return to the plant and to add two mooring lines to Barge RBL702B.

37.     Sanchez, while not specifically trained in mooring barges, had performed that task on

---

[8] Dkt. #185 at 42.

occasion during his previous employment with Houtex Metals Company, Inc.  Sanchez secured two additional lines from the dock to Barge RBL702B.  He did not adjust any of the lines on the barges and Keith did not ask him to do so.  Sanchez again left the Proler facility at about 6:00 p.m. on June 8, 2001.  It was not raining at the plant at that time.

38.     The first Flash Flood Warning for Harris County was issued at 5:10 p.m. after Proler had closed.  It cited rainfall in areas away from and downstream of Proler.  The 5:30 p.m. Flash Flood Warning cited Fort Bend and Brazoria Counties.  The 7:12 p.m. Flash Flood Warning again cited primarily areas of Harris County which were away from and which did not affect Proler or the Buffalo Bayou or White Oak Bayou systems.  It was not until the 7:55 p.m. Flash Flood Warning that rainfall was cited as possibly impacting the area of the Proler plant or the Buffalo Bayou system where the Proler facility was located.  The Flash Flood Warning did not expressly predict rainfall amounts, intensities, or durations close to those which ultimately caused the extreme flooding on June 9, 2001.  At 7:55 p.m. a River Flood Warning bulletin was issued citing flooding on Greens Bayou and other waterways south and east and downstream of Proler.  Neither Buffalo Bayou nor White Oak Bayou were noted in these warnings.  It was not until 12:05 a.m. on June 9, 2001 that a River Flood Warning was issued for the White Oak Bayou.

39.     As of about 6:00 p.m. five mooring lines secured Barge OR6275 which was fully loaded and awaiting a tug to move her to the fleet as per the call made by Keith earlier that day; partially loaded Barge RBL702B was secured by six lines.

40.     At approximately 6:15-6:30 p.m. on June 8, Smith called Keith to advise him that the storm was going to be turning around and heading back to Houston.  The two men

agreed that they should return to the Proler facility from their homes in Dayton, Texas.
The two men initially planned to meet at a neutral location and drive in one vehicle.
While Smith was prepared to leave immediately, Keith was still not available to meet
Smith until 30 to 40 minutes later.  The two thus drove separately.  Keith left his home
between 7:30 and 7:45 p.m.  However, Keith did not make it to the plant due to major
highway flooding.  Smith succeeded in reaching the Proler facility at about 9:00 p.m.

41.     After checking on the Proler warehouse and setting up pumps to prevent a possible
pollution event, Smith proceeded to the Proler dock to check on the barges at around
9:30 or 10:00 p.m.  There were no lights on the Proler dock.  At that time, the mooring
hardware was not yet underwater.  The barges appeared to be riding comfortably.  There
were six lines on one barge and five on the other.

42.     At the Proler facility, Smith did not know where any additional lines were stored and did
not feel capable of adding lines in the rain and dark, so he did nothing more to secure the
two barges.

43.     Smith returned every 40 minutes or so to an overlook from which he could see the docks at
the Proler facility. The water did not cover the Proler dock until after midnight on June 8,
2001.

44.     At General Stevedores downstream of Proler, two barges at that facility were each
secured to their dock by two polypropylene lines when that facility closed on June 8,
2001.  Personnel returned to the facility to add two lines to each barge for a total of four
lines on each barge.

45.     At approximately 9:00 p.m. on June 8, 2001, the Master of the Tug RUBY GONSOULIN,

Captain Robert Verdin ("Verdin"), ordered his crew to stop discharging asphalt because there was lightning in the area. The crew of the RUBY GONSOULIN began monitoring and adjusting the lines on the asphalt barges as the water in the Houston Ship Channel rose.

46.     MOUNT WASHINGTON took extra steps to prepare for the heavy rain. While a vessel the size of the MOUNT WASHINGTON is normally moored with twelve lines,[9] the ship's crew had put out extra lines earlier in the week. By Friday, June 8, 2001, the MOUNT WASHINGTON was moored with twenty or more serviceable lines.

47.     Seven of the nine-man crew of the MOUNT WASHINGTON finished their workday on June 8, 2001 at around 3:30 p.m. and left for the day.[10] The ship's Chief Engineer, Stanley Clark ("Clark") and a steward stayed aboard the ship on the night of June 8-9, 2001; Vasco Worrell ("Worrell"), Second Assistant Engineer returned to the vessel later that night.

48.     Clark, the person in charge of the MOUNT WASHINGTON, checked the moor regularly until midnight, and the moor was holding well at that time.

49.     At approximately 1:00-1:30 a.m. on Saturday, June 9, 2001, the Barge ACL 9745B broke away from General Stevedores. At approximately 1:45 a.m. the crew of the Tug RUBY GONSOULIN felt a jarring allision as the Barge ACL9745B struck the asphalt barges in her tow. Verdin ran to the tug's wheelhouse and saw the Barge ACL9745B allide with the MOUNT WASHINGTON along the vessel's stern/port side.

50.     At the time Barge ACL9745B struck the MOUNT WASHINGTON, the barge was

---

[9] Dkt. #191, Direct Examination of Joe Grace, pg. 42.

[10] Defendants' Ex. 53, Dep. of Stanley Clark, pg. 8, lines 7-12.

empty.[11]

51.  The Barge ACL9745B's allision with the MOUNT WASHINGTON stove in a length of the moored vessel's hull plating on the starboard side, but did not further damage the MOUNT WASHINGTON.  The allision may have parted one of the MOUNT WASHINGTON's mooring lines, but the vessel's moor was not seriously weakened.[12]

52.  The fender system on Union Pacific's bridge 5A was made up of two fender walls.  Each fender wall consisted of at least 20-25, one-foot diameter pilings that were driven 12-15 feet into the channel floor and rose 7 feet out of the channel water when the water is at its normal level.  The pilings were reinforced by 3 inch thick by 12 inch wide planks.

53.  No objects other than the RBL702B, the OR6275, and the ACL9745B barges passed under the railroad bridge with sufficient speed and mass to destroy 20-25 driven pilings.

54.  No one witnessed the Barge ACL9745B going under the railroad bridge thus no eyewitness testimony exists as to whether it struck the fender system.  The water level in Buffalo Bayou was unknown at that time but can be estimated from other testimony.  At the time the ACL9745B passed under the railroad bridge, the ship channel water level was at least 10 feet above normal and possibly as high as 13 feet.[13]

55.  The Barge ACL9745B was drafting at most 2 feet in the water when it passed under the

---

[11] Defendant's Ex. 51, Dep. of Bradford Durocher, Sr., pg. 11, lines 9-14.

[12] Defendant's Ex. 49, Dep. of Robert Verdin, pg. 16, lines 5-10, pg. 17, lines 6-7; Defendant's Ex. 51, Dep. of Bradford Durocher, Sr., pg. 42, lines 6-15.

[13] *See* Defendant's Ex. 49, Dep. of Robert Verdin, pg. 20, lines 11-20; Defendant's Ex. 50, Dep. of Clark Ellender, Pg. 59, lines 19-21 (stated the water rose to 10 feet above normal); Defendant's Ex. 51, Dep. of Bradford Durocher, Sr., pg. 34, lines 8-16 (stated that the news said the water rose 13 feet above normal and that by his experience it rose between 12 and 13 feet).

railroad bridge on June 9, 2001.[14]  The Barge ACL9745B could not have struck the fender system because its bottom was in all likelihood at least one foot above the fender system when it passed under the bridge on June 9, 2001.[15]

56.   At approximately 2:00-3:00 a.m. on June 9, Smith noted that the water level at Proler was 2 feet higher than ever had been experienced before at Proler, that the two barges were leaning over towards the dock, and that the barge mooring lines were tight.

57.   At approximately 3:45 a.m. Smith saw that the barges had broken away.  He then called Keith, who contacted the United States Coast Guard to report the breakaway.

58.   The Relief Pilot of the Tug RUBY GONSOULIN, Captain Clark Ellender ("Ellender"), was in the tug's wheelhouse with Verdin when the Barges OR6275 and RBL702B emerged from under the Union Pacific railroad bridge abreast and adrift with the current in the Houston Ship Channel at approximately 4:00 a.m. on Saturday, June 9, 2001.

59.   The Barges OR6275 and RBL702B are both 35 feet wide by 195 to 200 feet long. Drifting abreast, the two barges presented a solid steel face at least 70 feet wide as they floated down Buffalo Bayou.

60.   The distance between the two sides of the Union Pacific railroad bridge fender system is 106 feet 9 inches.[16]  The Barges OR6275 and RBL702B were unmanned and uncontrolled as they passed under the bridge.  Tug-boat captains have a difficult time

---

[14] *See* Defendant's Ex. 49, Dep. of Robert Verdin, pg. 50, lines 13-18 (stated that the ACL9745B was drafting one foot in the water); Dkt. #191, at 3 (stated that empty barges draft two feet in the water).

[15] *See* Defendant's Ex. 51, Dep. of Bradford Durocher, Sr. at 14, lines 5-18.

[16] *See* Joint Pretrial Order (Dkt. #148), No. 28, at 27.

navigating single barges under the bridge without laying up against the fender walls;[17] therefore, it defies logic to assume the Barges OR6275 and RBL702B passed side by side under the bridge aligned so accurately as to strike no part of the bridge's fender system.

61.   The Barge RBL702B weighed approximately 300 tons and was half loaded, making its total weight approximately 1000 tons.  The manner in which a barge is loaded will effect how the barge drafts.  The Barge OR6275 was fully loaded and drafting at least 9 feet in the water.  The bow of the Barge RBL702B was drafting 8 feet in the water and its stern was drafting 6 feet in the water.  If the bow of the RBL702B came through drafting at 8 feet, it would have hit the piling system by 2 feet with a force of two million pounds.

62.   Marine Surveyor Joe Grace ("Grace") testified that there was damage to the bottom of the Barge RBL702B which was likely caused by the piling system.

63.   The Barge RBL702B was the but for and proximate cause of the damage to the fender system on Union Pacific's bridge 5A.

64.   After the breakaway barges destroyed the railroad bridge fender wall, Verdin and Ellender watched as the Barges OR6275 and RBL702B struck the asphalt barges in the Tug RUBY GONSOULIN's tow, then drifted down onto the MOUNT WASHINGTON, which was moored at the Port Authority's City Dock 4.

65.   The Barges OR6275 and RBL702B allided with the MOUNT WASHINGTON's rudder

---

[17] *See* Defendant's Ex. 50, Dep. of Clark Ellender, Pg. 70, lines 11-15; Defendant's Ex. 51, Dep. of Bradford Durocher, Sr., pg. 47, line 21 to pg. 48, line 3; Defendant's Ex. 52, Deposition of Richard Hardy pg. 33, line 23 to pg. 35, line 5.

with such force that they knocked the vessel's rudder hard to port.[18]

66.　The MOUNT WASHINGTON's moor was adequate to survive the flooding if the vessel's rudder had remained amidships.  However, the allision's misplacement of the MOUNT WASHINGTON's rudder past hard left exposed a flat surface to the current in the Houston Ship Channel, vastly increased the water pressure on the MOUNT WASHINGTON's stern, and created a chain reaction of parting lines and failed mooring hardware.  Even as the moor began to fail due to this huge pressure, some lines withstood the torrent for nearly six hours and at least one tore a bollard off the wharf without failing.

67.　After the vessel was struck, additional mooring lines parted and the vessel's stern pulled farther away from the dock.  No watch was being maintained on the MOUNT WASHINGTON to respond to the emergency.  No one onboard the MOUNT WASHINGTON was awake on June 9, 2001 until about 5:00 a.m.

68.　On the MOUNT WASHINGTON, Worrell was awakened very early in the morning by a loud bang and a heavy jolt.  He saw that the ship's power was off and, looking out the porthole of his stateroom, he realized that the vessel's moor had been damaged.  Harbor tugs were alongside trying to assist the ship.

69.　Worrell started a generator to restore power, then woke Clark.  The two men tried to move the ship's rudder back to amidships using a hydraulic hand crank, but found the machinery so badly damaged as to make the task impossible.

70.　The two men also attempted to retrieve parted mooring lines to assist the tugs which

---

[18]  After a joint survey of the Barge RBL702B, the surveyors agreed that a crease down the barge's bow was the impression made by the barge's allision with the MOUNT WASHINGTON's rudder.

were holding the MOUNT WASHINGTON in place.  As the crew compliment had been released, there were insufficient men onboard to perform that task.

71.  With the MOUNT WASHINGTON's rudder jammed hard left, the exaggerated current in the Houston Ship Channel came to bear heavily on the ship's stern, and the force transmitted through the stern line ripped the mooring hardware to which the lines were secured from City Dock 4.

72.  Harbor tugs remained alongside the MOUNT WASHINGTON trying to even the strain on the remaining mooring lines, but the current shifted constantly.  As the forces proved too strong, the dock's mooring hardware could not hold the dynamic strains and the moor failed from the stern forward.

73.  At approximately 10:00 a.m. on Saturday, June 9, 2001, the MOUNT WASHINGTON broke away from her moor.  While several of the mooring lines did not part, the hardware to which they were secured tore out of City Dock 4.

74.  There is no direct evidence that a full crew on board the MOUNT WASHINGTON could have prevented the breakaway.

75.  Clark ultimately relayed orders he received from office vessel management personnel to attempt to move the MOUNT WASHINGTON back to her berth as offsite management in New Orleans was worried the vessel would go aground.  The tugs lost the vessel during that maneuver.

76.  The mooring hardware, including the cleats, on City Dock 4 were adequate to sustain the moor of the MOUNT WASHINGTON and survive the flooding if the barge breakaway and resulting allision had not occurred.

77.    Further, the MOUNT WASHINGTON's failure to maintain a full crew did not make the vessel unseaworthy.  To the contrary, the vessel would not have broken away if it were not for the Barges RBL702B and OR6275 alliding with the ship's rudder.

78.    The contract operator for the MOUNT WASHINGTON acted reasonably by asking tugs attending the vessel to push the ship's stern off the opposite bank of the Houston Ship Channel, where it drifted after the mooring hardware pulled out of City Dock 4. Otherwise, the MOUNT WASHINGTON would have been left hard aground, blocking the Ship Channel and subjecting it to tremendous structural stresses, as the flood waters subsided.

79.    After the breakaway, the MOUNT WASHINGTON drifted downstream onto the EQUALITY STATE and the DIAMOND STATE, alliding with each of the vessels in turn.  The final allision with the DIAMOND STATE caused both vessels to surge, allide into, and come to rest against the Port Authority's City Dock 15.

80.    This allision caused substantial damage to the concrete facing and rubber fenders of City Dock 15 at about the 350-foot mark on the wharf.  Prior to the allision events on June 8-9, 2001, the concrete facing and rubber dock fenders in this area of City Dock 15 were not damaged.

81.    Keith was informed on the morning of June 9, 2001 that the Barges RBL702B and OR6275 had been moored on the ship channel.  Still stranded by flood waters, Keith called Hatfield to attend at the site where Barge RBL702B was moored.

82.    On Sunday June 10, 2001, Hatfield attended the Proler facility where he observed the parted mooring lines still attached to the dock bollards.  Hatfield instructed Keith to preserve those portions of the mooring lines.  When Keith returned to the Proler facility

on June 12, he discovered that the parted mooring lines were not on the bollards but had been removed and could not be located.  Keith speculated that Proler's employees removed and discarded the lines while cleaning the dock on June 11, following the flood.  Keith did not order that the lines be removed, discarded or destroyed.

83.   Hatfield found the other end of each of the mooring lines on the barges at the Megafleet Towing Company ("Megafleet") facility, where the barges had been moored after the allisions.  Hatfield testified that he observed six mooring lines on Barge RBL702B and five mooring lines on Barge OR6275.[19]  The lines appeared sound but were stretched and parted towards the middle of the lines.  The lines did not part at or slip off the barge bits.

84.   While these portions of the lines were still in existence, they could not be removed by hand as they were too taught as a result of being pulled during the flood.  He made a request to Megafleet personnel to remove the mooring lines and advised Megafleet that the remains of the lines should be saved for future inspection.  When Hatfield called Megafleet a few weeks later to obtain the lines, Megafleet could not locate them.  Hatfield did not order the destruction of the mooring lines.

85.   The missing lines were not discarded or destroyed in bad faith.

86.   Hatfield testified that upon examining the remnants of the mooring lines on the barges which were moored at Proler's facility, he determined that all the lines used to moor the Barges RBL702B and OR6275 were nylon lines.  That testimony is uncontroverted.

87.   Though Joe Grace testified that Proler should have moored the barges with a minimum of six doubled lines, that testimony was contradicted by both Frenzel and Hatfield who

---

[19] Dkt. #185, at 83.

19

intimated that using twelve lines would have been impractical.  The Court gives more weight to the opinion of Frenzel and Hatfield in this instance, because they have more experience with mooring barges than Grace, whose expertise lies with larger ships.

88.    Though weather warnings citing the extreme nature of the storm were not issued until late in the evening on June 8, 2001, Proler had adequate warning that there would be flooding, regardless of the fact that it did not know the full magnitude of that flooding.  Moreover, L. Ray Hoxit, Ph.D., a Certified Consulting Meteorologist, testified on behalf of the Plaintiffs that he thought the weather service did a good job predicting the extent of the storm and that its estimates were "within the ball park" of what actually transpired.

89.    Proler took  inadequate precautions on June 8 in light of the 11:00 a.m. Flash Flood Watch. This point is highlighted by contrasting the precautions took on June 8 with the precautions took as a result of the less serious June 5 warning. Though there is no evidence indicating whether Keith heard the June 5 watch, Keith was responsible for monitoring the weather. In the face of that weather forecast, Keith evidently determined that it would be prudent to remain at the Proler facility and add extra lines to the barges.  Keith did not leave Proler until 8:00 p.m. on June 5.  Up until that time he remained on site to monitor a barge and the Buffalo Bayou water level.

90.     The Flash Flood Watch issued at 11:00 a.m. on June 8, 2001 reflected a more serious situation.  The June 8 watch was addressed to twenty-two counties in Southeast Texas, including Harris County.  Both watches warned of potential danger.  However, the June 8 watch warned of more rainfall than the June 5 watch.  While the June 5 watch only predicted 5 and possibly 8 inches of rain, the June 8 watch warned of possible

accumulations in excess of 10 inches as a result of rain falling at a rate of 1-1.5 inches per hour through the evening and overnight. Both watches warned listeners that the bayous could overflow. However, unlike the June 5 watch, the June 8 watch also warned that the grounds were already saturated and that this would affect flooding.

91. Keith left the Proler facility between 3:30 and 4:00 p.m. on June 8, 2001 despite the fact that the June 8 watch was more serious and that he had one more barge docked at the Proler facility than he did on the night of June 5.

92. In light of the 11:00 a.m. Flash Flood Watch, it was negligent for Keith to leave the Proler facility as early as he did on June 8. Had he not left early, he could have ensured that other Proler employees remained at the facility to assist him in monitoring the barges and adjusting their lines if necessary. The actions Keith took after he left work cannot be considered adequate preparation for the predicted flooding.

93. Proler's lack of sufficient, experienced personnel in the face of disaster constituted negligence. Proler's expert witness, Steven P. Weiss, testified that it was feasible, prior to June of 2001, for Proler to revise its hurricane preparedness plan to provide phased responses to weather watches and warnings and to provide for the training of all personnel in how to properly take appropriate precautions.[20] Had this discrepancy been corrected prior to June, 2001, appropriate precautions to prevent the breakaways could have been taken on June 8, 2001.

94. No facility at which barges are moored can be considered prepared for rising water unless all lines by which a barge is moored are properly adjusted to even the strain on

---

[20] *See* Plaintiff United States' Ex. 8, Dep. of Steven Weiss, pg. 21, lines 9-21.

the lines and experienced personnel are on hand to adjust the lines as the water rises. Proler did not exercise ordinary care by leaving the barges, without experienced personnel present, in the face of the weather forecasts and advisories broadcast on the NOAA weather radio.

95. Neither the United States nor the MOUNT WASHINGTON were contributorily negligent in causing the damage to its vessel, the EQUALITY STATE, the DIAMOND STATE, or the City Docks.

96. There is no evidence that either Union Pacific or the Port Authority were contributorily negligent or that either's negligence, if any, was a cause of the damage done to Union Pacific railroad bridge's fender system or the Port Authority's docks.  There is no evidence that either Union Pacific Railroad Company or the Port Authority failed to mitigate the damages done to the Union Pacific railroad bridge fender system and the Port Authority's City Docks 4 and 15.

97. The allision with the Union Pacific railroad bridge destroyed an entire section of the bridge's fender system causing $210,914.92 in damage, which by agreement of the parties has been depreciated down to $147,766.00.

98. The MOUNT WASHINGTON was repaired in Orange, Texas, Charleston, South Carolina, and Portland, Oregon.  The EQUALITY STATE and the DIAMOND STATE were repaired in Houston.   The United States claimed damages in excess of $1,274,036.50, however, in Plaintiffs' Joint Request for Findings of Fact and Conclusions of Law, the United States proposes that its damages are only $1,274,036.50. Based upon the United States indications at the trial that it would reduce its damages

figure to account for expenses that it would have had to incur had its ships not been damaged, the Court construes this as a voluntary reduction of its claimed damages. Therefore, the Court finds the United States to have incurred damages of $1,274,036.50, plus interest and costs.

99.    Following the allision events, Richard Barren, C.M.S. ("Barren"), surveyed City Docks 4 and 15 on June 27, 2001, at the request of the Port Authority.

100.   At City Dock 4, Barren found that one deadman and two mooring cleats, number 11 and number 12, were pulled loose from City Dock 4 by the MOUNT WASHINGTON on or about June 9, 2001.  The mooring hardware was subsequently replaced at expense to the Port Authority.

101.   At City Dock 15, Barren found new damage to the concrete wharf structure of the dock at or about the 350-foot mark.  The dock's concrete frontal beam was destroyed and would have to be replaced between the two frames and the top deck or cap at least 2 feet inside.  Three rubber dock fenders were also damaged, and one rubber dock fender was missing.  The dock fenders and concrete frontal beam are integral parts of the City Dock 15 wharf structure.

102.   Repair costs to the Port Authority to fix the damage to City Docks 4 and 15 included $76,777.84 in labor and materials and $5,510.15 in reasonable overhead charges, making the Port Authority's full claim for the damage repairs $82,287.99, plus interest and court fees.

103.   The repairs to City Docks 4 and 15 did not extend the life or enhance the value of the structures.

**Conclusions of Law**

1. This is a consolidated admiralty case under FED. R. CIV. P. 9(h) and subject matter jurisdiction exists under the Court's admiralty jurisdiction, 28 U.S.C. §1333.

2. Where the tort suffered by a plaintiff is maritime and not of mere local concern, the rights and liabilities of the parties arise out of and are dependent upon the general maritime law and cannot be enlarged or impaired by State law. *East River Steamship Co. v. Transamerica DeLaval, Inc.*, 476 U.S. 858, 864-65 (1986); *Robins Dry Dock Co. v. Dahl*, 266 U.S. 449, 457 (1925). The Constitution mandates that all cases of admiralty and maritime jurisdiction are subject to the judicial power of the United States, U.S. CONST. art. II, § 2, cl. 3, and where state law conflicts with the general maritime, the federal law is superior and must be applied. *Garrett v. Moore-McCormack, Inc.*, 317 U.S. 239, 243-45 (1942); *Southern Pac. Co. v. Jensen*, 244 U.S. 205, 212 (1912). The supremacy of the general maritime law is necessary to the preservation of its uniformity. *See Green v. Vermillion Corp.*, 144 F.3d 332, 340-41 (5th Cir. 1998).

3. Proler had a bailment for the Barges RBL702B and OR6275, so Proler is the party responsible for the Barges RBL702B and OR6275. *See* MEMORANDUM AND ORDER, signed on November 17, 2004, at 10; *see also Dow Chemical Co. v. the Barge UM-23B*, 424 F.2d 307, 311-12 (5th Cir. 1970)*; John I. Hay Co. v. The ALLEN B. WOOD*, 121 F. Supp. 704, 708 (E.D. La. 1954), *aff'd sub nom, Martin Oil Service, Inc. v. John I. Hay Co.*, 219 F.2d 237 (5th Cir. 1955).

4. When Proler accepted custody of the Barges OR6275 and RBL702B, however informally, it took on the responsibilities of a shipmaster, so it was required to monitor

the weather, evaluate the forecasts broadcast by the National Weather Service, and prepare its facility and the barges moored there for hazards–even calamitous floods–in every way possible. *Boudin v. J. Ray McDermott and Co.*, 281 F.2d 81, 84-85 (5th Cir. 1960).

5.   Under the general maritime law, it is well settled that when a drifting vessel causes damage to a stationary object, there is a presumption that the moving ship is at fault. *The LOUISIANA,* 70 U.S. (3 Wall) 164, 173 (1865). This presumption of negligence is based on the logical deduction that a drifting vessel was mishandled or improperly moored. *See James v. River Parishes Co., Inc.*, 686 F.2d 1129, 1132-33 (5th Cir. 1982). The Fifth Circuit has noted:

> In admiralty, this presumption does more than merely require the ship to go forward and produce some evidence on the presumptive matter. The moving vessel must show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident.

*Bunge Corp. v. M/V FURNESS BRIDGE*, 558 F.2d 790, 795 (5th Cir. 1977) (quoting *Patterson Terminals, Inc. v. S/S JOHANNES FRANS*, 209 F. Supp. 705, 707 (E.D. Pa. 1962)). The presumption thus has the effect of shifting the burden onto the moving ship. *Delta Transload, Inc. v. M/V Navios Commander*, 818 F.2d 445, 449 (5th Cir. 1987). That burden rests heavily upon the defendants who must disprove their fault by a preponderance of the evidence. *James*, 686 F.2d at 1132. They can satisfy this burden by showing that the accident could not have been prevented by "human skill and precaution and a proper display of nautical skills." *Id.* Defendants "'must exhaust every reasonable possibility which the circumstances admit and show that in each they did all

25

that reasonable care required.'" *Bunge Corp.*, 558 F.2d at 795 (quoting *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967)).

6.      A defendant may defend on the grounds of an act of God.   "[A]n act of God is defined as any accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected, could have been prevented." *Brown v. Sandals Resorts International*, 284 F.3d 949, 954 (8th Cir. 2002) (relying on South Dakota law). Courts interpreting the act of God defense have considered a number of factors, including: (1) the severity of the natural occurrence causing the damage; (2) the reasonable predictability of this natural occurrence; (3) the lack of human agency in the damage to the property; and (4) the reasonableness of any precautions.   *Inspat Inland, Inc. v. Am. Commercial Barge Line Co.*, 2002 WL 32098290, at *8 (N.D. Ind. 2002); *Uniroyal, Inc. v. Hood*, 588 F.2d 454, 460 (5th Cir. 1979) (holding that under Georgia law, "an act of God, from which no tort liability can arise, is an accident caused by physical causes which are irresistible or inevitable, such as lightening, storms, perils of the sea, earthquakes, inundations, sudden death or illness."); *Farr Co. v. Union Pac. R. Co.*, 106 F.2d 437, 439 (10th Cir. 1939) (finding that an act of God can be "a sudden and extraordinary flood" and that a defendant is liable if it reasonably could have anticipated damage by such an act).

7.      The burden of proving an inevitable accident or an act of God rests heavily upon the vessel asserting such [a] defense. *Bunge Corp.*, 240 F.3d at 929.  Proler thus bears the burden of disproving fault by a preponderance of the evidence.  The Court finds that Proler failed to carry its burden.

8.     As a shipmaster, Proler had a heightened duty to stay informed about weather conditions, and could not "trust to some providential intuition" that the water would not overflow.  *See Boudin*, 281 F.2d at 84.   Though the rainfall and flooding were unprecedented, it was not unforeseeable or unpredictable.   If a flash flood watch or warning is issued, shipmasters should anticipate that their facilities may flood and that vessels in their care may breakaway.

9.     Proler did not have an adequate number of "trained and experience personnel" to tend the barges.  *Valley Line Co. v. Musgrove Towing Service, Inc.,* 654 F. Supp. 1009 (S.D. Tex. 1987).

10.    Proler failed to take a number of precautions that were reasonable in light of the weather reports on June 8, 2001.[21]

11.    Due to its negligence, Proler may not avail itself of the act of God defense.  *The Clarita*, 90 U.S. (23 Wall.) 1, 13, 23 L.Ed. 146 (1874) ("Unless it appears that both parties have endeavored by all means in their power, with due care and a proper display of nautical skill, to prevent the collision, the defense of inevitable accident is inapplicable to the case.").

12.    The presumption that a moving vessel that collides with a moored vessel is at fault "can only be rebutted by clear proof of a contributing fault."  *The OREGON*, 158 U.S. 186, 197 (1895) (citing *The CITY OF NEW YORK*, 147 U.S. 85 (1893)).

13.    To the extent Proler argues that the United States was contibutorily negligent for the allision

---

[21]  The Plaintiffs have consistently argued that Proler should have used wire instead of nylon lines.  Though Proler theoretically could have used wire ropes, such a practice would not have been practical.

by failing to maintain a lookout, it is well settled that the absence of a special or proper lookout does not subject a vessel to liability for damages for collision, unless such absence has actually contributed to the collision.[22] *The ELK*, 3 Cir., 1900, 102 F. 697, 698, 42 C.C.A. 598 (citing *The Blue Jacket*, 144 U.S. 371, 389 (1892) ("It is well settled that the absence of a lookout is not material, where the presence of one would not have availed to prevent a collision.")).  Proler has produced no evidence suggesting that the MOUNT WASHINGTON in any way contributed to the actual collision itself.  Fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract.  *Bd. of Commr's of Port of New Orleans v. M/V FARMSUM*, 574 F.2d 289, 297 (5th Cir. 1978).  Accordingly, no contributory fault can be attributed to the United States with respect to the allision itself.  *See* 144 U.S. at 389.

14.     The Supreme Court recognized the continuing validity of proximate and superseding causation in admiralty in *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837-38 (1996).  Where the proximate causation is wholly attributable to an unforeseeable intervening event, the intervening event is a superseding cause and the party responsible for the superseding cause is wholly liable for the resulting damages.  *See id.* at 839.

15.     The barges' allision with the MOUNT WASHINGTON's rudder was an extraordinary event not reasonably foreseeable to the crew of the MOUNT WASHINGTON.  It so changed the MOUNT WASHINGTON's circumstance that it proximately caused the MOUNT WASHINGTON's subsequent breakaway and allision with the downstream ships.  The

---

[22] An allision is a type of collision, one in which a moving vessel collides with a stationary object.

barges' allision is a superseding cause of the MOUNT WASHINGTON's breakaway, regardless of any shortcomings in the MOUNT WASHINGTON's storm preparations. More men aboard the ship could not have prevented the subsequent breakaway and no causative fault can be assigned to the MOUNT WASHINGTON.

16.    The superseding cause doctrine simply dictates that the barges' allision with the ship's rudder rather than the United States's alleged negligence was the cause of the damages to the EQUALITY STATE and the DIAMOND STATE, as well as the damages to the Port Authority's City Docks 4 and 15.

17.    In addition to the doctrines of proximate and superseding causation, the doctrine of in extremis is well settled in admiralty law. The Supreme Court stated the rule in *The Blue Jacket* as follows:

> As was held in *The Bywell Castle*, 4 Prob. Div. 219, 'where one ship has, by wrong manoeuvres, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been manoeuvred with perfect skill and presence of mind.'

144 U.S. at 392. The Supreme Court also referred to the doctrine in *The OREGON*, 158 U.S. at 204, where it stated, "the judgment of a competent sailor in extremis cannot be impugned." The First Circuit has stated that the in extremis doctrine is only applicable when the party asserting it was free from fault until the emergency arose. *See Bucolo, Inc. v. S/V JAGUAR*, 428 F.2d 394, 396 (1st Cir. 1970).

18.    Prior to the barges' allision with the vessel's rudder, which was an unforeseeable intervening event, the MOUNT WASHINGTON was without fault. The problems stemming from the MOUNT WASHINGTON's failure to maintain a full complement arose after the allision (i.e., the "emergency") arose. While it was required to take adequate precautions against

rain and flooding it was not required to take precautions against the possibility of negligently moored barges.

19.    Proler is estopped from criticizing the handling of the MOUNT WASHINGTON after the initial allision, whether reasonable or not, because Proler's negligence in loosing the barges down the Ship Channel put the MOUNT WASHINGTON in extremis.

20.    Plaintiffs contend that Proler discarded the lines that moored the Barges RBL702B and OR6275 on June 8-9, 2001 because it knew the examination of the lines would reveal a weakness in their case.  Plaintiffs urge the Court to draw an adverse inference that the lines were inadequate to properly moor the Barges RBL702B and OR6275.

21.    The clearest definition of spoliation comes from the Second Circuit, which has defined it as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

22.    While various sanctions might be imposed, the most common is an inference that the evidence despoiled would have been unfavorable to the party responsible for its destruction. *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).

23.    The Fifth Circuit has allowed an adverse inference only where the circumstances of the destruction of potential evidence manifest bad faith, opining that, "[m]ere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." *Vick v. Texas Employment Commission*, 514 F.2d 734, 738, *rehr'g denied*, 520 F.2d 944 (5th Cir. 1975) (citing McCormick on Evidence § 273 at 660-61 (1972); 31A C.J.S. *Evidence* § 156(2) (1964)).  The Court has determined that neither Keith nor Earl Hatfield ordered the lines to

be destroyed and that the lines were not discarded or destroyed in bad faith. As such, the Court declines to infer that the lines were inadequate to properly moor the Barges RBL702B and OR6275.

24.     Damages in admiralty are measured by the diminution in value of damaged property, lost earnings where appropriate, and prejudgment interest. The reasonable cost of repair is generally regarded as the equivalent of diminution in value. *Delta Marine Drilling Co. v. M/V BAROID RANGER*, 454 F.2d 128, 129 (5th Cir. 1972). The cost of repair includes the cost of drydocking if necessary to accomplish the repair. *See Mitsui O.S.K. Lines v. Horton & Horton, Inc.*, 480 F.2d 1104, 1106 (5th Cir. 1973). A party must demonstrate "with reasonable certainty that the damages claimed were actually or may be reasonably inferred to have been incurred as a result of the collision." *Id.* at 1106.

25.     In cases involving allisions with a fixed structure, the measure of damages includes the cost of repairs without any deductions for depreciation, if the repairs do not extend the life or enhance the value of the structure. *Freeport Sulphur Co. v. S/S HERMOSA*, 526 F.2d 300, 304-06 (5th Cir. 1976); *Paktank Corp. v. M/V M.E. NUNEZ*, 35 F. Supp. 2d 521, 530-31 (S.D. Tex. 1999).

26.     Similarly, depreciation cannot be applied to damages to a fixed marine structure when the damages are to integral parts or areas of the structure, and regardless of their condition, would need to be replaced if the structure as a whole were replaced. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505-06 (5th Cir. 1994) (discussing *Oregon v. TUG GO-GETTER*, 468 F.2d 1270 (9th Cir. 1972)).

27.     Reasonable overhead charges may be included in the repair costs even if the injured plaintiff

effects the repairs itself because such charges would be billed by any outside contractor hired to complete the repairs.[23]  *Freeport Sulphur*, 526 F.2d at 304.  The overhead charges should be reasonable in amount and factually related to the actual repair work performed.  *United States v. M/V GOPHER STATE*, 472 F. Supp. 556, 559 (E.D. Mo. 1979), *aff'd*, 614 F.2d 1186 (8th Cir. 1980).

28.     The Fifth Circuit has called it a bedrock premise and the rule rather than the exception that prejudgment interest is awarded in actions under the general maritime law unless unusual circumstances make an award inequitable.  *Ryan Walsh Stevedoring Co. v. James Marine Services*, 792 F.2d 489, 492 (5th Cir. 1986).  In fact, the District Courts have no discretion to deny prejudgment interest unless peculiar circumstances make the award of prejudgment interest inequitable.  *Noritake Co. v. M/V HELLENIC CHAMPION*, 627 F.2d 724, 729 (5th Cir. 1980).

29.     In the Fifth Circuit, the general rule in admiralty cases is that prejudgment interest is to be awarded from the date of the casualty, thereby compensating the plaintiff in full.  *Probo II London v. M/V ISLA SANTAY*, 92 F.3d 361, n.2 (5th Cir. 1996) (citing *Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026, 1028 (5th Cir. 1986); *King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1187 (5th Cir. 1984)).

30.     There are no peculiar circumstances which exist here to deny an award of prejudgment interest to the Plaintiffs.

---

[23] Proler submits that to recover overhead charges, the evidence must show that a third party contractor would have charged the same amount.  Proler cites no case law in support of this position.  The Court finds Proler's argument to be without merit.  *See, e.g., Baltimore & Ohio Railroad Co. v. Commercial Transport, Inc.*, 273 F.2d 447, 448-49 (7th Cir. 1960).

**Conclusion**

For the reasons set forth above, Proler is liable to Plaintiffs Union Pacific Railroad Company, the United States of America, and the Port of Houston Authority of Harris County, Texas, for the damages resulting from the breakaway of the Barges RBL702B and OR6275 on the night of June 8-9, 2001.  Accordingly, judgment shall be entered in favor of the Plaintiffs, awarding $147,766.00 to Union Pacific Railroad Company; $1,274,036.50 to the United States of America; and  $82,287.99 to the Port of Houston Authority of Harris County, Texas.

It is so ORDERED.

Signed this 3rd day of October, 2006.

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE